UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|                              |   |                   |
|------------------------------|---|-------------------|
| THOMAS D. SPINDLER,          | ) |                   |
|                              | ) |                   |
| Plaintiff,                   | ) | Case. No. 11 C 3683 |
| v.                           | ) |                   |
|                              | ) | Magistrate Judge  |
| Michael J. Astrue,           | ) | Arlander Keys     |
| Commissioner of Social       | ) |                   |
| Security                     | ) |                   |
| Defendant.                   | ) |                   |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff, Thomas Spindler ("Mr. Spindler" or "Plaintiff"), seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") finding him not disabled and denying his claim for Social Security Benefits under Title II of the Social Security Act, 42 U.S.C. §§416 and 423. This case is before the Court on cross-motions for summary judgment. Mr. Spindler raises several issues for review, including: 1) whether the Administrative Law Judge ("ALJ") committed reversible error by not giving the medical opinion of Dr. Dekhtyar controlling weight, 2) whether the ALJ failed to weigh the medical opinion evidence based on the requirements set out in 20 C.F.R. 404.1527(d), 3) whether the ALJ improperly concluded that, because Mr. Spindler was able to complete basic tasks, he was not disabled, 4) whether the ALJ improperly determined that Mr. Spindler could perform work based on his ability to complete very simple tasks at home, 5) whether the ALJ improperly substituted

her own lay opinion in determining Mr. Spindler's Residual

Functional Capacity (RFC), 6) whether the ALJ improperly

determined that Mr. Spindler's claims of debilitation due to pain

and mental limitations were not credible, and 7) whether the ALJ

failed to take adequately into account how Mr. Spindler's obesity

may affect his other impairments.  For the reasons set forth

below, Claimant's motion for summary judgment is denied, and the

Commissioner's motion for summary judgment is granted.

BACKGROUND FACTS

PRE-DECISION PROCEDURAL HISTORY

On October 29, 2007, Mr. Spindler filed a Title II

application for disability benefits, alleging disability

beginning April 2, 2006.  The claim was initially denied on

February 6, 2008, and again upon reconsideration on June 16,

2008.  Thereafter, Mr. Spindler filed a timely request for a

hearing, which was conducted on July 7, 2009.  Mr. Spindler, age

43 at the time of his alleged disability onset date, subsequently

changed age category to that of a "younger individual" between

the age of 45-49 as defined by 20 CFR 404.1563 by the time of his

hearing.  ALJ Janice Bruning issued a ruling denying benefits on

January 4, 2010, finding that Mr. Spindler was not disabled under

sections 216(I) and 223 of the Social Security Act.

POST-DECISION PROCEDURAL HISTORY

Mr. Spindler requested review by the Appeals Council but was denied on April 29, 2011. Thus, the ALJ's decision became the final decision of the Commissioner. Mr. Spindler filed a complaint with this court on June 9, 2011, seeking a review of the decision. The parties consented to exercise of jurisdiction by a magistrate judge on July 14, 2011. Thereafter, cross-motions for summary judgment were filed. This Court has jurisdiction pursuant to 42 U.S.C. §405(g).

HEARING TESTIMONY

I. Claimant's Hearing Testimony

At the July 7, 2009 hearing before the ALJ, Mr. Spindler, who was born on February 15, 1963, appeared and was represented by counsel. He testified that he received his GED and was in the navy from 1980 to 1981. [R. 37] He did not receive any special training while in the service, nor does he have any other vocational or specialized training. Id. He testified that he is married and lives in a house with his wife and their 12 year-old daughter. [R. 36] His wife works 10 hours a week at a church. Aside from a public aid health card, they receive no other public assistance. [R. 37] Mr. Spindler testified that he stopped driving about a year ago because it began to set off migraine headaches, and he also would freeze up at heavily congested intersections. [R. 48]

With regard to his daily routine, Mr. Spindler testified that his wife performs the majority of the daily tasks including

grocery shopping, driving, making the bed, and taking out the garbage. However, he can take a chair to the sink to wash dishes, he can do the laundry, sweep, prepare himself a meal, and he can mow the lawn in small sections. [R. 49-50] His wife and daughter care for several family pets, while he is solely able to care for his pet snake by feeding it mice and occasionally cleaning its tank. [R. 51] Mr. Spindler testified that his typical day begins around 10:00am, as the medication his psychiatrist prescribed makes him sleepy. [R. 54] After rising, he turns on the lamp for his snake, checks the mail, watches television and makes lunch. *Id.* His wife leaves to work at the church, while he stays home. *Id.* During the day, he is unable to sleep, and often spends time stretching his back out on the couch. [R. 54, 48-49] He testified that, overall, his medication keeps him sleepy and he gets dizzy regularly each day. [R. 55] Depending on how he feels, he usually goes to bed around 9:00pm or 11:00pm. [R. 54]

Mr. Spindler testified that he rarely drinks, and added that he can no longer do so on his medications. [R. 45] He also testified that he has not smoked marijuana since 2007. *Id.* For entertainment he testified to enjoying watching television, listening to shortwave radios, and that he took up teaching himself the guitar. [R. 54] He testified to using the computer to check email and search Craigslist for approximately half an

4

hour each week. *Id.* He used to enjoy canoeing and mountain biking, but has not canoed since 2006 due to the issues with his shoulder. *Id.* Mr. Spindler testified to having some issues regarding his daily personal care, including difficulty putting on his pants because his right leg does not lift high enough, and that because he can not reach behind himself well, when he goes to the bathroom he must take a shower with a spray hose afterward. [R. 49] With regard to socialization, Mr. Spindler testified that he has one friend and does not enjoy socializing with people often. [R. 50] He regularly attends Sunday morning church service and occasionally attends activities and performances in which his daughter participates. [R. 51]

With regard to his work history, Mr. Spindler testified that his last real job was in 2006 when he worked for Standard Safety Equipment. [R. 40] He stopped working there when he had to have a stent placed in his heart on April 2, 2006. *Id.* He began a new machine shop job shortly after the stenting, but was only able to work for a couple weeks before he had to quit due to severe headaches and dizziness. [R. 42] Mr. Spindler testified that he worked in his brother's machine shop off and on during 2007 and 2008. [R. 38-39] He did not work there everyday, but instead his brother would "throw him a couple of hours and if he had to leave and go home it was okay with him." [R. 39] He testified that he also did a couple other small jobs in 2007,

each job required standing and the lifting of small parts no heaver than 20 pounds. [R. 42-43] Mr. Spindler testified that he stopped working for his brother because his back hurt too much to continue and he could no longer drive himself to work due to migraine headaches. [R. 40, 48]

With regard to his ailments and medication, Mr. Spindler testified that he currently suffers from severe back pain. *Id.* He has had physical therapy, pool therapy, and takes medication to treat his back. [R. 43] He testified that he did not want to take any pain medication, but he does go for regular check-ups regarding his heart, and takes medication for his hypertension. Mr. Spindler testified that, since the stenting, he has not had any other major issues regarding his heart. *Id.* He originally was prescribed a CPAP, but has since switched to the use of a BIPAP in order to sleep. *Id.*

Mr. Spindler testified that, shortly after the stenting operation, he began to experience trouble with his vision. [R. 44] He testified that watching rotating things or driving would bring on a headache and flickering in his eyes. *Id.* After experiencing body pain and weakness, Mr. Spindler testified, he saw a doctor and was tested for a stroke. *Id.* However, the results were negative. The doctor explained that he had a bad reaction to Lipitor and took him off of the drug. *Id.* Mr.

6

Spindler testified that, although his shoulder and hip never fully recuperated from the reaction, he is better now. [R. 44]

With regard to his limitations and abilities, Mr. Spindler testified that he can stand on his feet for approximately 15 minutes before his back starts hurting. He is able to walk the length from his car to the middle of a shopping center, and then needs to sit before his back tightens and locks. [R. 45] He testified that lifting a gallon of milk with his right arm causes pain, but his left arm is in "pretty good shape." [R. 46] He testified to having difficulty climbing stairs, and explained that his left leg goes numb and he does not have feeling there. *Id*. He was told by a doctor that the numbness is related to his back problems. *Id*. He testified to having difficulty when bending, stooping, crouching, crawling, and kneeling. *Id*. His balance in general is good, however he has difficulty reaching overhead and in front with his right arm. *Id*. He testified that his hands are ok. *Id*. He testified to occasionally using a cane for assistance when walking, although it was never doctor recommended. [R. 54-55]

Mr. Spindler testified that he does not sleep well at night, as his dreams sometimes keep him up. [R. 47] He went to a psychiatrist and was prescribed medication for the issue. *Id*. He testified to seeing the psychiatrist for the past six months, about once a month. *Id*. He was told he was suffering from

depression and schizophrenia. *Id.* He testified that when he was younger, he was diagnosed with schizophrenia and took medication to control it, as well. *Id.* Mr. Spindler testified that the current medication consisted of four pills, and that they made him tired and he always felt kind of bored, however the medication had caused a lot of his problems and racing thoughts to stop. [R. 47-48] He testified to having racing thoughts and other problems associated with his schizophrenia while he was working, and to cope, he would go to the bathroom until it ceased. [R. 48] His employers were never aware of his issue, however his brother knew and would allow him to leave when he needed. *Id.*

## II. Vocational Expert's Hearing Testimony

The ALJ also heard testimony from Timothy Grobowski, a Vocational Expert ("VE") who reviewed Mr. Spindler's work record and heard Mr. Spindler's testimony before the ALJ. After being asked to describe Mr. Spindler's past work history, the VE testified that Plaintiff previously worked as a machinist, a slitter operator, and a maintenance tech individual. [R. 57-58] Mr. Spindler's previously held positions ranged in the DOT at medium, light, and heavy exertional levels. *Id.* The VE testified that none of the skills Mr. Spindler previously obtained are transferable to sedentary work. *Id.*

The VE testified that, although Mr. Spindler could no longer perform any of his previous jobs, there were still other jobs in existence within the national economy that he could perform at his current level of ability. [R. 58-59] The ALJ questioned the VE on the availability of jobs that avoided exposure to heights, moving machinery, vibration, and noise at Mr. Spindler's level of skill, work experience, and education. [R. 58] The hypothetical individual could lift and carry 10 pounds occasionally, less than 10 pounds frequently; could stand and/or walk a total of two hours during an eight-hour workday with a sit and stand option at will; could sit at least six hours during an eight-hour workday with a sit/stand option at will; could occasionally climb ramps and stairs; could occasionally balance, stoop, crouch, and crawl; and could have only occasional contact with the public, coworkers, and supervisors. [R. 59-60] The VE testified that there were several sedentary level positions that met the needs of such a hypothetical person, including hand packer (2,000 positions in the Chicago area), bench assembler (3,000 positions in the Chicago area), and inspector (1,000 positions in the Chicago area). [R. 59]

The VE testified that the above positions would be unavailable, however, to an individual with the aforementioned limitations if the individual was unable to work three days per month. [R. 60] Additionally, the VE testified that, if due to

anxiety or for whatever reason, the individual were to be off-task an average of 20 percent or more of the workday, there would be no competitive employment, as well.  *Id*.


### III. MEDICAL RECORDS

In addition to the testimony of Mr. Spindler and the VE, the ALJ also considered Mr. Spindler's relevant medical records from his doctors, whom he had been seeking treatment from concurrently.

#### Heart Issues

On April 4, 2006, Mr. Spindler was admitted to Northern Illinois Medical Center to undergo a cardiac stenting and catherization after a coronary angiography demonstrated significant right coronary disease and moderate LAD disease.  [R. 201-207]  Dr. Mujahid Hussain conducted the initial consultation, noting that Mr. Spindler was a 43-year old male with a history of obstructive sleep apnea, palpitations, dyspnea, hypertension, hypercholesterolemia, obesity, and LV systolic dysfunction. [R. 201]  Mr. Spindler noted to Dr. Hussain that he drinks on a daily basis and, although he does not smoke cigarettes, he smokes marijuana daily and has done so for the past 30 years.  *Id*.

During his physical examination, Dr. Hussein noted that Mr. Spindler was morbidly obese[1] but did not appear to be in any distress. Dr. Douglas Tomasian successfully performed the cardiac stenting and catherization and recommended continued medical therapy for the cardiomyopathy. [R. 208]

Mr. Spindler returned to the hospital on January 16, 2007, after suffering several episodes where his vision suddenly blurred, his speech and hearing became garbled, and he had difficulty walking. [R. 217-219] His vision, hearing, and speech returned to normal within a couple hours, however, his walking remained impeded. [R 217, 379]. Attending physician Dr. Daniel Nepomuceno physically examined Mr. Spindler and found him to be a well developed male in no acute distress at the time. However, while attempting to ambulate, he found him to have obvious ataxia and a staggering gait. [R. 218] Dr. Nepomuceno determined that Mr. Spindler's left ventricle was enlarged, and although the symptoms suggested that he had suffered a transient ischemic attack (TIA) or stroke, the tests returned unremarkable. [R. 217] He was medicated with a regimen of coreg, enalpril, plavix, aspirin as needed, and was told to discontinue his use of lipitor. The doses of some of his medications were altered and

---

[1]Mr. Spindler is five-foot five inches and his weight has mostly fluctuated between 242-290 pounds.

11

he was advised that they would continue to monitor the progression of his coronary artery disease. *Id*.

Sleep Issues

Mr. Spindler stated to his doctors that he had dealt with sleep problems for almost 20 years, he had difficulty falling asleep, and his wife had noticed sleep apnea. [R. 201] Dr. Hussain recorded that he has no prior surgical history but underwent a sleep study in 2005, after being diagnosed with obstructive sleep apnea. *Id*. Although the results of the study are unknown, he was prescribed a CPAP at 15cm of water pressure to help regulates his breathing. *Id*. The mask initially helped him sleep through the night uninterrupted, but by 2006 its efficacy had decreased. On several occasions, Mr. Spindler saw Dr. Pocholo Florentino, his primary care physician, with complaints of continued obstructive sleep apnea. [R. 211-213] Each time, Dr. Florentino readjusted Mr. Spindler's CPAP pressure, prescribed a heated humidifier, and suggested a follow-up reassessment after a few months. *Id*. By 2008, progress had reversed and Mr. Spindler once again complained of excessive daytime sleepiness and un-refreshing sleep. [R. 468]

Dissatisfied with Dr. Florentino, Mr. Spindler began to regularly see Dr. Daniel Nepomuceno to address his sleep issues. Dr. Nepomuceno noted that Mr. Spindler had been on a CPAP using an auto-titrating pressure range from 14-18 cm of water pressure

12

on a nightly basis. [R. 467] He used the therapy on average seven to eight hours a night, and during a polysomnography performed on September 10, 2008, it was determined revolution of events was achieved at 14 cm. *Id*. Mr. Spindler explained that he felt like he awoke at 3:00am and was unable to get back to sleep. However, the polysomnography demonstrated that at 3:00am he was awake for approximately one hour and then achieved REM sleep from approximately 3:45am to 6:00am. *Id*.

Dr. Nepomuceno started Mr. Spindler on a trial of Ambien in an effort to improve his nighttime sleep hours, but discontinued it after a poor response caused him to wake up in the middle of the night, take more Ambien, and sleep walk outside. [R. 467] Dr. Nepomuceno determined that Mr. Spindler's sleep apnea is well controlled by the CPAP settings and that he appears to have sleep-state misconception, in that he feels he is not sleeping at night when in fact he is. *Id*. Additionally, Dr. Nepomuceno concluded that Mr. Spindler may have an underlying psychiatric disorder, and referred him for a psychiatric evaluation. [R. 467]

Psychiatric Issues

In September 2008, Mr. Spindler was referred by Dr. Nepomuceno for a psychiatric evaluation after he stated that during periods in the middle of the night he would see dismembered torsos floating through the air and would experience

13

"weird sexual thoughts in his head." [R. 467] Psychiatrist Dr. Aleksandr Dekhtyar, M.D., first met with Mr. Spindler in October of 2008 and diagnosed him with schizoaffective disorder. [R. 549] Dr. Dekhtyar determined that Mr. Spindler's short-term memory was impaired, he displayed poor ability in almost all work-related mental abilities, and his moods ranged from sad and angry to anxious. [R. 540-549] His initial Global Assessment Function Score in October of 2008 was assessed at 35-40, and later his scores ranged from 45-60 during several visits in 2009. *Id.*

Back Issues

After Mr. Spindler described suffering from severe back pain at the hearing, the ALJ held the record open so that he could submit evidence of said claim. Plaintiff submitted a one-paragraph note signed by Dr. Eric Hoeper on August 26, 2009 stating that Mr. Spindler had been under his care, treated with physical therapy and medication, and that he recommends he be evaluated by a spine surgeon. [R. 537]

Additionally, the record contained evidence that, on July 1, 2008, Mr. Spindler had an MRI of his lumbar spine performed. The MRI revealed multilevel disc desiccation and spondylolisthesis of L5 over S1. [R. 499] The examination was compared to a lumbar spine MRI that was performed in 2000, and the doctor concluded that no significant interval change had occurred. *Id.*

14

IV. THE ALJ'S DECISION

The ALJ issued her decision on January 4, 2010, finding that Mr. Spindler had not been under a disability within the meaning of the Social Security Act from April 2, 2006 through the date of her decision. [R. 19] The ALJ applied the five-step sequential analysis as required by the Act, under 20 C.F.R. 404.1520(a).

At step one, the ALJ determined that Mr. Spindler had not engaged in substantial gainful activity since April 2, 2006 (the alleged onset date). [R. 21]

At step two, the ALJ determined that Mr. Spindler had several severe impairments including: hypertension, headaches, coronary artery disease with stenting, sleep apnea, spondylolisthesis, obesity, and schizioaffective disorder. [R. 21]

At step three, the ALJ concluded that Mr. Spindler did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments from 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525 and 404.1526). [R. 22] The ALJ explained that, although Mr. Spindler suffers from "severe" impairments, considered individually or amalgamated, they still do not meet the criteria of any of the Listings. *Id*. Moreover, the ALJ determined that the limitations Mr. Spindler claims are not supported by his

testimony as to his daily routines and undertakings, nor by the doctors' treating notes. *Id*.

At step four, the ALJ concluded that, although Mr. Spindler's impairments would preclude him from his past relevant work, his residual functional capacity would allow him to successfully adjust to performing sedentary work as defined in 20 C.F.R. 404.1567(a). [R. 23] The ALJ found that Mr. Spindler required a position that at a maximum required 10 pounds of lifting occasionally, and less than 10 pounds frequently; provided for standing and/walking for only 2 hours within an 8 hour day; sitting for 6 hours in an 8 hour day, with a sit/stand option at will; never require him to climb ladders, ropes, or scaffolds; only occasionally climb ramps/stairs; occasionally balance, stoop, kneel, crouch, or crawl; must avoid concentrated exposure to work hazards including heights and moving machinery, vibration, and noise; and limited to work that has no more than occasional contact with the public, coworkers, or supervisors. *Id*.

In making her decision, the ALJ noted that she considered all of his symptoms and the extent to which the symptoms could reasonably be accepted as consistent with objective medical evidence and other evidence, as required under 20 C.F.R. 404.1529 and SSR's 96-4p and 96-7p. [R. 23] Additionally, the ALJ considered opinion evidence in accordance with 20 C.F.R. 404.1527

16

and SSR's 96-2p, 96-5p, 96-6p, and 96-3p.  [R. 36]  Next, the ALJ

briefly summarized the testimony of Mr. Spindler and stated:

> After careful consideration of the evidence, the
> undersigned finds that the claimant's medically
> determinable impairments could reasonably be expected
> to cause the alleged symptoms; however, the claimant's
> statements concerning the intensity, persistence and
> limiting effects of these symptoms are not credible to
> the extent they are inconsistent with the above
> residual functional capacity assessment.  [R. 25]

The ALJ then summarized all of Mr. Spindler's medical records.

[R. 25]  After this review, the ALJ stated:

> In sum, the above residual functioning capacity
> assessment is supported by good control of sleep apnea
> if claimant uses CPAP or BiPAP. His activities of daily
> living do not support complaints of disabling back pain
> or mental problems. He did not actually seek mental
> health treatment until October 2008, more than two
> years after his alleged onset date.  [R. 25]

The ALJ concluded by finding that Mr. Spindler retained the

residual functional capacity to perform at the sedentary

exertional level.  [R. 26]

At step five, after considering the testimony of the VE and

the limits of his residual functional capacity, the ALJ

determined that Mr. Spindler was unable to perform any past

relevant work, under 20 C.F.R. 404.1565. [R. 26]  However, the

ALJ found that transferability of job skills was not material to

the determination of disability because the use of the Medical-

Vocational Rules (SSR 82-41 and 20 C.F.R. Part 404, Subpart P,

Appendix 2) supported a finding that Mr. Spindler was not

disabled, whether or not the claimant had transferable job skills. *Id*.

Finally, the ALJ reviewed the testimony of the VE and found there to be a significant number of jobs that existed in the national economy that Mr. Spindler could successfully adjust to given his age, education, work experience, and residual functional capacity under 20 C.F.R. 404.1569 and 20 C.F.R. 404.1569(a). [R. 26-27] He qualified for occupations such as hand packer, bench assembler, and inspector, which totaled 6,000 positions within the Chicago area. [R. 27] Thus, the ALJ determined a finding of "not disabled" appropriate under the framework of the above cited rules, and that Mr. Spindler was not entitled to benefits. [R. 27]

## STANDARD OF DISABILITY ADJUDICATION

In order to be entitled to benefits under the Social Security Act, a claimant must be evaluated under a five-step inquiry and found to be "disabled." 20 C.F.R. § 404.1520. Step one requires the ALJ to determine whether the claimant is employed. Under step two, the ALJ must determine whether the claimant has a severe impairment as defined by the Social Security Administration. At step three, the ALJ determines whether the impairment meets or is medically equal to one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. During step four, the ALJ evaluates the claimant's "Residual

18

Functional Capacity" ("RFC") and determines whether he can perform his past relevant work. Finally, during step five, the ALJ determines whether the claimant has the ability to perform any other work that exists in the national economy.

## STANDARD OF REVIEW

When addressing an appeal of an ALJ's decision, a district court must affirm the decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). When determining whether the evidence is substantial, it must be "more than a mere scintilla." *Richardson v. Perales*, 402 U.S. 401 (1971). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* When reviewing the ALJ's decision for substantial evidence, the court cannot "displace the ALJ's judgment by reconsidering facts or evidence or making [a] credibility determination." *Skinner v. Astrue,* 478 F.3d 835 (7th Cir. 2007). Should there be conflicting evidence that leads reasonable minds to differ in opinion, it is solely the ALJ's responsibility to determine whether the claimant is disabled, not the district court. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). Even though an ALJ is not required to address every piece of evidence in the record, she must furnish her analysis through building a logical and accurate bridge between the evidence and her conclusions, thus allowing a reviewing court to conduct a meaningful review of the ultimate findings of the

Social Security Administration. *Sims v. Barnhart*, 309 F.3d 424, 429 (7th Cir. 2002); *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). A court must affirm the ALJ's decision if there is substantial evidence supporting her decision, unless the ALJ does not articulate the grounds for her decision in such a way that allows a meaningful review. *Sims*, 309 F.3d at 429.

## ANALYSIS

Mr. Spindler raises several objections to the ALJ's decision; the Court will discuss each in turn. Claimant argues that: 1) the Administrative Law Judge ("ALJ") committed reversible error by not giving the medical opinion of Dr. Dekhtyar controlling weight, 2) the ALJ failed to weigh the medical opinion evidence based on the requirements set out in 20 C.F.R. 404.1527(d), 3) the ALJ improperly concluded that because Mr. Spindler was able to complete daily tasks, he was not disabled, 4) the ALJ improperly determined that Mr. Spindler could work based on his ability to complete very simple tasks at home, 5) the ALJ improperly substituted her own lay opinion in determining Mr. Spindler's Residual Functioning Capacity (RFC), 6) the ALJ improperly determined that Mr. Spindler's claims of debilitation due to pain and mental limitations were not credible, and 7) the ALJ failed to take adequately into account how Mr. Spindler's obesity may affect his other impairments.

### A. WHETHER THE ALJ ERRED BY FAILING TO GIVE THE TREATING PSYCHIATRIST'S OPINION CONTROLLING WEIGHT.

Mr. Spindler first contends that the ALJ committed reversible error by failing to give his treating psychiatrist, Dr. Aleksandr Dekhtyar's, opinion controlling weight. Pl.'s brief at 7. Mr. Spindler relies on two Seventh Circuit cases to underscore that ALJs must accept the treating physician's opinion as controlling, or provide sound reasoning as to why he/she did not. *See Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011); *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010). Plaintiff correctly directs the Court to such authority, however, he seems to overlook the caveat which both cases provide, explaining that ALJs are to treat the opinion of a treating physician as controlling "...*if* it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence." *Punzio*, 630 F.3d at 710(emphasis added). Here, the ALJ explained that she did not find Dr. Dekhytar's opinion to be well-supported by clinical findings nor consistent with other evidence, and she elaborated upon why.

The ALJ concluded that Dr. Dekhtyar's opinion was not supported by contemporaneous treatment notes or Plaintiff's testimony at the hearing [R. 22], and, accordingly, was not entitled to controlling weight. *See* 20 C.F.R. § 404.1527(d)(2); Social Security Ruling (SSR) 96-2p (in order to be entitled to

controlling weight, a medical opinion must be rendered by a treating source, be well-supported by medically acceptable clinical and laboratory diagnostic techniques, and also must not be inconsistent with other substantial evidence in the record).

Dr. Dekhtyar completed a "Mental Impairment Questionnaire (RFC & Listings)" form in January 2009 wherein he expressed his opinion of Mr. Spindler's functioning, described above. [R. 513-522] Significantly, when asked to describe the clinical findings, including mental status examination results, that demonstrated the severity of Plaintiff's mental impairment and symptoms, Dr. Dekhtyar only wrote "paranoia, depression, insomnia, and nightmares," [R. 514], which were not clinical findings, but appear to the Court to be a recitation of Mr. Spindler's reported symptoms.

Additionally, when Mr. Spindler presented to Dr. Dekhtyar in October 2008, over two years after his April 2006 alleged onset of disability, Dr. Dekhtyar noted that Plaintiff was alert and cooperative, with appropriate affect and spontaneous speech, although he was sad, angry, and anxious, and had circumstantial speech, paranoid delusions, and poor judgment. [R. 549] Dr. Dekhtyar subsequently saw Plaintiff in December 2008, January, March, April, May, June, July, and August 2009. [R. 539-547] He continued to report variable findings and prescribe medication. [R. 539-549] Notably, by March 2009, Dr. Dekhtyar observed that Plaintiff had better grooming that day and decreased paranoia

with no vivid dreams. [R. 544] Plaintiff's nightmares increased in April 2009 [R. 543], but by May 2009, Plaintiff reported that he was doing better that day and had no nightmares. [R. 545] Dr. Dekhtyar indicated Plaintiff was stable. [R. 545] Again in June 2009, Dr. Dekhtyar noted that Plaintiff was doing better and was stable. [R. 542] Considering the content of Dr. Dekhtyar's contemporaneous treatment notes, the ALJ reasonably concluded that they did not support his opinion that Mr. Spindler had severely marked limitations in functioning.

The ALJ also appropriately concluded that Dr. Dekhtyar's opinion was not supported by Plaintiff's own testimony within the record. [R. 22] For example, at the hearing, Plaintiff testified that he lived with his wife and twelve-year-old daughter. [R. 36-37] He was able to prepare a meal for himself, clean the dishes by sitting at the sink, and he was able to do laundry; He could sweep up a mess on the floor and mow the lawn in small sections; Mr. Spindler went shopping about once every two weeks; stated that he had one friend; went to church; attended a band performance when his daughter played the flute; and took care of his pet snake. [R. 49-52] Mr. Spindler additionally testified to passing the day by watching television, using the computer about once a week, and often listening to police scanners and shortwave radio. [R. 51, 53] He was also in the process of teaching himself how to play the guitar. [R. 54] He explained that he sold his canoe, mountain bike, and weight

set because he could no longer use them due to his shoulder pain. [R. 53]  Finally, Mr. Spindler even testified to being able to hide his mental issues from his employers, explaining how he coped with having racing thoughts by going to the bathroom until they ceased.  [R. 48]  He testified that, aside from his brother, employers were never aware of his issue.  *Id*.

Thus, to the extent Mr. Spindler experienced some limitation in his daily activities, it appears they were largely the result of his physical limitations, rather than due to any mental difficulties.  Therefore, the ALJ provided a logical bridge leading to her conclusion that Mr. Spindler's daily activities did not depict an individual severely disabled by mental impairments.  [R. 25]  The Court agrees that, because the administrative record fails to provide substantial evidence of Mr. Spindler's severely disabling mental limitations, the ALJ reasonably concluded that Dr. Dekhytar's opinion should not be entitled to controlling weight.

**B. WHETHER THE ALJ FAILED TO PROPERLY WEIGH DR. DEKHTYAR'S MEDICAL OPINION.**

Along the same vein as the first contention, Mr. Spindler additionally avers that the ALJ failed to gauge the credibility of Dr. Dekhtyar's diagnosis pursuant to 20 C.F.R. § 404.1527, which requires an ALJ to determine credibility based on factors including the treatment relationship, the extent and nature of the treatment, the physician's speciality, and the consistency of

the treatment.  Pl.'s brief at 8-9.  Conversely, the Commissioner argues that, contrary to Plaintiff's claim, the ALJ properly considered Dr. Dekhtyar's opinion and diagnosis pursuant to the relevant regulatory factors, specifically recognizing the governing regulations and rulings in her decision.  Resp. at 7. The Court agrees.  The ALJ specifically noted that Dr. Dekhtyar only began treating Mr. Spindler in October 2008, more than two years after his alleged onset of disability [R. 22], thus considering the length of the treatment relationship.  *See* 20 C.F.R. §404.1527(d)(2)(I).  She also recorded that Mr. Spindler was referred to Dr. Dekhtyar for mental health treatment [R. 22], recognizing that he was a mental health specialist.  *See* 20 C.F.R. 404.1527(d)(5). As discussed above, the ALJ also properly noted that this opinion of disability was not well-supported by the record.  [R. 22].  *See* 20 C.F.R. § 404.1527(d)(2),(3); SSR 96-2p.  Thus, considering the supportability factor, the Court finds that the ALJ reasonably gave reduced weight to Dr. Dekhtyar's opinion because it was not well-supported. [R. 22]

While the regulation identifies a number of factors an ALJ shall consider, it does not require that the ALJ articulate her consideration of each and every one.  20 C.F.R. § 404.1527(d). The regulations provide instead, that the ALJ will consider all of the factors, and her decision will "give good reasons in our notice of determination."  20 C.F.R. § 404.1527(d)(2).  The Court agrees that the lack of record support for Dr. Dekhtyar's opinion

25

and its inconsistency with other substantial record evidence, along with specific examples cited in the ALJ's decision, constitute "good reasons" for reducing the weight of his opinion.

### C. WHETHER THE ALJ IMPROPERLY SUBSTITUTED HER JUDGEMENT FOR THAT OF MR. SPINDLER'S TREATING PSYCHIATRIST.

Along the same line of argument as above, Mr. Spindler additionally contends that the ALJ improperly substituted her own judgment for that of Dr. Dekhtyar's. Pl.'s brief at 9-12. Mr. Spindler argues that the ALJ dismissed Dr. Dekhtyar's conclusions outright, and instead employed an unidentified and unsupported scale with regard to analyzing Mr. Spindler's psychotic disorder. Pl.'s brief at 10. On the contrary, the Court finds that the ALJ complied with the regulatory instruction on rating the degree of Plaintiff's functional limitations, and provided support for her conclusion that Mr. Spindler did not meet or medically equal the criteria of Listing 12.03. [R. 22-23]

At step three of the sequential evaluation, the ALJ considered Listing 12.03, *Schizophrenic, Paranoid and Other Psychotic Disorders,* and found that Mr. Spindler's mental impairment did not meet or medically equal the criteria of the listing. [R. 22] In making this finding, the ALJ considered whether the "paragraph B" criteria are satisfied, properly

26

applying the special technique described in 20 C.F.R. §
404.1520a. [R. 22-23] In order to meet Part B of Listing 12.03,
Plaintiff's impairment must result in at least two of the
following:

    1. Marked restriction of activities of daily living; or

    2. Marked difficulties in maintaining social functioning; or

    3. Marked difficulties in maintaining concentration,
persistence, or pace; or

    4. Repeated episodes of decompensation, each of extended
duration.

    Listings 12.03, 20 C.F.R. Part 404, Subpart P, Appendix 1.
The ALJ noted that the phrase "marked limitation" means "more
than moderate but less than extreme." [R. 22] Repeated episodes
of decompensation, each of extended duration, means "three
episodes within 1 year, or an average of once every 4 months,
each lasting for at least 2 weeks." *Id*.

    With that, the ALJ reasonably concluded that, with regard to
activities of daily living, Mr. Spindler's mental impairment
resulted in a mild limitation, as he testified to doing some
chores, going to the store every two weeks, and caring for a
snake. [R. 23] With regard to social functioning, the ALJ
determined him to have moderate difficulties, as he testified to
having one friend and going to church on Sunday. *Id*. With
regard to concentration, persistence or pace, the ALJ determined
him to have mild difficulties, as he testified to being able to

27

use a computer, listen to radio scanners, watch televison, and is learning to play the guitar. *Id.* As for episodes of repeated decompensation of extended duration, the ALJ determined that Mr. Spindler had none, as the record provided no indication of hospitalization or inpatient treatment for mental problems. [R. 23].

According to the Seventh Circuit authority Mr. Spindler cites, the ALJ appropriately came to the conclusion that Mr. Spindler is not disabled as a result of his mental impairment. *See Richards v. Astrue*, 370 F. Appx. 727, 730 (7th Cir. 2010)(holding that if there are no episodes of decompensation and the rating in each of the categories is none or mild, the impairment generally is not considered severe and the claimant thus is not disabled). The responsibility for deciding the issue of whether a claimant's impairment meets or equals a listing is explicitly reserved to the Commissioner, and a medical source opinion on this issue is not entitled to any special significance. 20 C.F.R. § 404.1527(e)(2), (3). The ALJ was not required to grant controlling weight to Dr. Dekhtyar's opinion that Plaintiff had marked limitations, she analyzed and discussed the record evidence, and reasonably concluded that Plaintiff did not have a listing-level impairment. The Court agrees, finding the ALJ's decision supported by substantial evidence, free from legal error.

28

Finally, Mr. Spindler complains that the ALJ did not obtain a third-party psychiatric evaluation, Pl.'s brief at 11, however, Plaintiff ignores the fact that he initially alleged disability based upon physical impairments. [R. 140, 172, 182] The record reflects that Mr. Spindler's mental health treatment was made known to the Agency only at the hearing before the ALJ, and Plaintiff, through counsel, acknowledged that he had not yet submitted any mental health treatment records, stating, "I am sorry. I should have told you about that." [R. 47] Significantly, it does not appear that Mr. Spindler, represented by counsel, ever requested a psychiatric consultative examination or additional input from a mental health professional. Considering these circumstances, the Court finds it disingenuous to now fault the ALJ for not developing the record regarding Plaintiff's mental condition.

### D. WHETHER THE ALJ IMPROPERLY DETERMINED PLAINTIFF NOT DISABLED BASED ON HIS BEHAVIOR AT HOME

Next, Mr. Spindler contends that the ALJ conflated his basic home skills and improperly concluded that he possessed the abilities necessary to participate in the workforce. Pl.'s brief 12-13. Plaintiff relies upon *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012), wherein the Court clarified that a claimant's ability to perform daily minimal tasks is not inconsistent with his disability being severe. Although Mr. Spindler is correct to caution that activities of daily living and activities of a full-

time job are not equal, the Court finds that the ALJ did not improperly consider his home behaviors. [R. 24]

At the hearing, Plaintiff testified to being able to take on a menagerie of daily life tasks including: prepare a meal for himself; do dishes by sitting at the sink; do laundry; sweep up a mess on the floor; mow the lawn in small sections; go grocery shopping about once every two weeks; go to church; attend a band performance when his daughter played; give water to his dog; take care of his snake; watch television; order radios off Craigslist; browse the internet; listen to police scanners and shortwave radio; and he was in the process of teaching himself how to play the guitar. [R. 49-54] Mr. Spindler's attempt to now diminish the necessary motor, mental, and social skills necessary to perform the daily activities he regularly takes on is unavailing. The ALJ permissibly considered Plaintiff's daily activities, 20 C.F.R. § 404.1529(c)(3)(I), and reasonably concluded that they supported a finding that he could perform a range of sedentary work.

### E. WHETHER THE ALJ FAILED TO PROVIDE EVIDENCE OF HER DETERMINATION OF PLAINTIFF'S RFC.

Next, Mr. Spindler argues that the ALJ failed to provide an adequate explanation for how she determined Mr. Spindler's RFC, that her finding is not supported by substantial evidence because it was not based on the medical records, and that she took no steps to compile his complete medical history." Pl.'s brief at 13-16. The Commissioner counters that the ALJ's residual functional

capacity is not based on any single opinion and is, instead, based on all the relevant evidence in the case record as a whole. *See* 20 C.F.R. § 404.1545(a). The Court agrees and finds that the ALJ clearly supported her decision with the medical evidence of record.

The ALJ considered and discussed Plaintiff's treatment history as well as the record physician opinions, including Dr. Nepomuceno's opinion. [R. 21-25] The ALJ explained that she gave little weight to Dr. Nepomuceno's opinion that Mr. Spindler experienced several work-related limitations due to sleep apnea because he did not explain how, when successfully treated, his sleep apnea precluded work activity. [R. 25] Contrary to Plaintiff's claim, the ALJ was not required to re-contact Dr. Nepomuceno, as the ALJ did not indicate that the basis for Dr. Nepomuceno's opinion was unclear or that there were ambiguities in the evidence or that the evidence was inadequate to determine whether Plaintiff was disabled. *See* 20 C.F.R. § 404.1512(e). Instead, she correctly found that Dr. Nepomuceno's opinion was not supported by, and was inconsistent with, the treatment records showing that Plaintiff's sleep apnea was now well controlled. [R. 25] *See Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) ("An ALJ need recontact medical sources only when the evidence received is inadequate to determine whether the claimant is disabled. *See* 20 C.F.R. § 404.1512(e). Here, the evidence was adequate for the ALJ to find *Skarbek* not disabled, and the ALJ

acted within his discretion in deciding not to call a medical expert.").

With regard to his cardiac condition, Mr. Spindler opines that the ALJ reached her conclusion without medical support there, as well. Pl.'s brief at 15. However, the Court finds that the ALJ also discussed Plaintiff's cardiac condition, finding his obesity to be a severe impairment. [R. 21, 25] Considering all the record evidence, the ALJ reasonably concluded that neither the existence of his cardiac condition, nor his obesity, precluded his performing a range of sedentary work. Contrary to Plaintiff's claim, the ALJ's finding was not without medical support. Notably, Drs. Aquino and Kenney, state agency physicians, reviewed the record evidence in February 2008 and June 2008, respectively, and concluded that Plaintiff could perform a range of light exertional work. [R. 384-91, 490-92] Significantly, Dr. Aquino explicitly noted Mr. Spindler's sleep apnea, cardiac condition, and BMI of 42. [R. 391] Rather than adopt this one assessment, the ALJ looked to the totality of the medical evidence and found that Mr. Spindler was further functionally limited, and restricted him to performing a range of sedentary work, the least exertional level of work, with a sit/stand at will option.

Lastly, Mr. Spindler, again, asserts that the ALJ failed to develop the record, stating that she was responsible for soliciting additional information and developing a complete medical history. Pl.'s brief at 13. Yet, the Court finds no indication that the

record evidence was not complete. At the hearing, the ALJ asked Plaintiff's counsel, ". . . anything missing from the file that you believe is essential to this case?". [R. 35] Plaintiff's attorney discussed some MRIs on a CD and expressly stated ". . . but that's the only thing that is missing." To that the ALJ stated that she would leave the record open for thirty days. [R. 35-36] Later in the hearing, Plaintiff's counsel stated that he would also submit Plaintiff's mental health records. [R. 47] After the hearing, Plaintiff, through counsel, submitted the additional evidence. [R. 533-549]

The Court finds Mr. Spindler's suggestion that the ALJ should not have relied on his counsel's express assertion, but should have expended additional time and resources and conducted her own search for additional evidence unacceptable. Mr. Spindler's reliance upon *Richards*, 370 Fed. Appx. at 731, stating that the ALJ "has a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernable", is unavailing as here, the ALJ clearly discerned the medical support and used it to inform her conclusion. Her conclusion happened to not be the exact same as that of Dr. Nepomuceno's, however, the Court finds that she adequately reached and explained it nonetheless.

## F. WHETHER THE ALJ INCORRECTLY ANALYZED THE CREDIBILITY OF PLAINTIFF'S TESTIMONY REGARDING HIS DAILY ACTIVITIES

Mr. Spindler next avers that the ALJ ignored his limitations and omitted facts that lend credibility to his claims. Pl.'s

brief at 16-18.  He contends that the ALJ described his
performance of various daily activities as inconsistent with his
claims of disabling pain and mental limitation, but failed to say
how they are inconsistent.  He relies upon the Seventh Circuit
holding in *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001),
that an ALJ must provide a detailed explanation when she
determines inconsistencies.  Mr. Spindler's reliance upon
*Zurawski* is misplaced, as he misses the point that, not only did
the ALJ provide the explanation *Zurawski* demands, but that there
is another long held stance of the Seventh Circuit, which is that
an ALJ's credibility findings are entitled to considerable
deference.

In *Imani ex rel. Hayes v. Heckler*, 797 F.2d 508, 512 (7th
Cir. 1986), *cert. denied*, 479 U.S. 988 (1986), the Court
articulated its well-established rule that ALJs' credibility
determinations will not be overturned unless "patently wrong."
In *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000), the Court
reiterated that "[b]ecause hearing officers are in the best
position to see and hear the witnesses and assess their
forthrightness, we afford their credibility determinations
special deference.... We will reverse an ALJ's credibility
determination only if the claimant can show it was 'patently
wrong.'" (Citations omitted).  The Court further observed that,
although an ALJ may not reject a claimant's subjective complaints
"solely because they are not fully supported by the medical

34

[evidence, the ALJ] may consider that as probative of the claimant's credibility." *Id.* (Citation omitted).

Here, the ALJ properly assessed the credibility of Mr. Spindler's complaints, properly considered his daily activities, 20 C.F.R. § 404.1529(c)(3)(I), (the listing of which has already been repeated twice above), and reasonably concluded that they supported a finding that he could perform a range of sedentary work with a sit/stand at will option. The ALJ even discussed Plaintiff's course of medical treatment, including his noncompliant use of prescribed medication, and testimony regarding his limitations. [R. 21, 24-25] Accordingly, she limited him to a range of sedentary work. The ALJ appropriately evaluated Plaintiff's credibility and reasonably concluded that Plaintiff's subjective allegations of severely disabling limitations were not credible.

Because the ALJ properly and thoroughly grounded her analysis in the evidence of record, her conclusion is not patently wrong, is entitled to substantial deference, and the Court finds that it should be upheld. *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003); *Shramek*, 226 F.3d at 811; *Steward v. Bowen,* 858 F.2d 1295, 1302 (7th Cir. 1988); *Ray v. Bowen,* 843 F.2d 998, 1002 (7th Cir. 1988).

**G. WHETHER THE ALJ FAILED TO CONSIDER PLAINTIFF'S OBESITY's AFFECT UPON HIS DISABILITY.**

Lastly, Mr. Spindler argues that the case requires remand for additional review, as the ALJ gave only a cursory examination of his obesity and its impact on his other impairments.  Pl.'s brief at 18-19.  Indeed, the Commissioner requires that ALJs evaluate a claimants' obesity in combination with the other impairments listed in his medical history.  SSR 02-1p.  Although the ALJ did not explicitly mention Social Security Ruling 02-1p during her evaluation of Mr. Spindler's obesity, she, nonetheless, found his obesity to be a severe impairment. [R. 21] Moreover, the ALJ reasonably concluded that the combination of his obesity, along with the existence of his cardiac condition and all of his other severe impairments, restricted him to performing a range of sedentary work.  The ALJ's failure to specifically mention how Mr. Spindler's obesity limits him does not constitute reversible error.  Mr. Spindler failed to show that he experienced additional functional limitations resulting from his obesity that were not already accommodated by the ALJ. Thus, the Court finds that the ALJ appropriately considered Mr. Spindler's obesity, as well as its impact when combined with his other severe impairments, and that substantial evidence supports her conclusion that it did not preclude him from certain sedentary work.

## **CONCLUSION**

For the reasons set forth above, Plaintiff's motion for summary judgment is denied, and the Commissioner's motion for

summary judgment is granted. The decision of the Commissioner is affirmed.

Dated: December 28, 2012

ENTER:

_____

ARLANDER KEYS

United States Magistrate Judge